UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**,<br><br>Plaintiff,<br><br>v.<br><br>**PAUL GILMAN,**<br>**OIL MIGRATION GROUP, LLC,**<br>**WAVETECH29, LLC,** and<br>**GILMANSOUND, LLC**<br><br>Defendants. | C.A. No.: 3:18-cv-1421<br><br>**Jury Trial Demanded** |

## FIRST AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC"), pursuant to Fed. R. Civ. P. 15(a)(1), files this First Amended Complaint against Defendants Paul Gilman ("Gilman"), Oil Migration Group, LLC ("OMG"), Wavetech29, LLC ("WaveTech"), and GilmanSound, LLC ("GilmanSound") (collectively, "Defendants") and alleges as follows:

## SUMMARY OF THE ACTION

1.      Gilman, through entities he controls, defrauded investors in securities offerings related to his purported development of soundwave technology. Gilman, who claims to be a music visionary, has launched a series of largely unsuccessful business ventures in the sound and music industry. During the relevant period, Gilman raised money from investors for GilmanSound, which he claimed would use soundwave technology to optimize sound systems in sport stadiums. GilmanSound began as a real business, but when it failed to perform, Gilman lied to investors about his use of the offering proceeds and misappropriated investor funds.

2. Touting GilmanSound and his purported expertise with soundwaves, Gilman moved outside the sound and music industry and raised money from investors for two oil and gas ventures—OMG and WaveTech. Gilman told investors that he would use their money to test, validate, further develop, and license his purported soundwave technology for use in oil-and-gas industry applications. Although Gilman has no apparent experience in the oil and gas industry, he claimed OMG and WaveTech would revolutionize the industry by using soundwave technology to lower the viscosity of oil and enhance water separation and purification processes involved in oil and gas exploration and production.

3. In truth, OMG and WaveTech were sham enterprises that operated as fraudulent vehicles for Gilman to solicit, receive, and misappropriate investor funds. Gilman spent substantially all of the money he raised from investors on personal expenses and other non-business items, such as luxury Las Vegas hotels, restaurants, designer clothing and home furnishings, large cash withdrawals at casino ATMs, and, in at least one instance, a Ponzi payment to an earlier investor. Gilman also made multiple misstatements and omissions to investors about the status of the purported soundwave technology and the use of investor funds.

4. From 2013 through 2016 (the "Relevant Period"), Defendants raised at least approximately $3.3 million from approximately 40 investors located in Texas and other states. That money is gone, and the investors (excluding Ponzi payments) received nothing in return.

5. By reason of their misconduct, Defendants violated the antifraud provisions of the federal securities laws, specifically Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Defendants should be permanently enjoined from violating these provisions of the securities

laws, required to disgorge all ill-gotten gains with prejudgment interest, and ordered to pay appropriate civil penalties.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)]. The investments offered, purchased, and sold as alleged herein were securities as defined under the Securities Act and the Exchange Act. Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce or the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

7. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district. Among other things, Defendants offered and sold securities at issue in this district and one of the largest investors resides in this district.

## DEFENDANTS

8. Defendant Gilman is an individual who is believed to reside in Las Vegas, Nevada. Gilman asserted his Fifth Amendment privilege against self-incrimination and refused to testify in connection with the SEC's underlying investigation.

9. Defendant OMG is a Texas limited liability company. Gilman controls OMG and holds OMG out as a business that utilizes soundwave technology for oil and gas extraction, storage, and transportation applications.

10. Defendant WaveTech is a Delaware limited liability company. Gilman controls WaveTech and holds WaveTech out as a business that utilizes soundwave technology to enhance water separation and purification processes involved in oil and gas exploration and production.

11. Defendant GilmanSound is a California limited liability company that has been suspended by the California Secretary of State. Gilman controls GilmanSound and holds GilmanSound out as a business that utilizes soundwave technology to optimize sound wave distribution in stadiums. After the Relevant Period, Gilman, upon information and belief, also formed and controls a Nevada limited liability company named GilmanSound LLC.

## FACTUAL ALLEGATIONS

### A. Background

12. Gilman claims to be a music visionary, producer, and award-winning composer. According to his internet biographies and postings, Gilman had a long career recording music for TV commercials, producing music for famous musicians, and releasing his own music albums. For example, self-dubbed as the "Whale Whisperer," Gilman produced and starred in a documentary of his musical encounters with dolphins and whales. In the years leading up to this action, Gilman engaged in a pattern of forming supposedly cutting-edge technology companies for the sound and music industry that failed to achieve commercial quality, generated little or no revenues, and disappeared.

13. Gilman's latest business in the sound and music industry is Defendant GilmanSound, which Gilman started in late 2009 and capitalized by raising money from individual investors. GilmanSound offers audio-engineering services to optimize existing speaker systems in arenas and stadiums. GilmanSound has actually provided services to several major league baseball teams for their stadiums. However, this has included only one "paid for"

installation, while the rest of the work was largely proof-of-concept work that Gilman provided at or below cost.

14. Beginning in approximately February 2013, Gilman started leveraging his purported "soundwave" expertise to raise money from oil and gas investors. Gilman has no disclosed experience in the oil and gas industry. Yet, Gilman claimed that he had developed a revolutionary technology based on "sonication" that would transform the oil and gas industry by using soundwaves to cheaply and effectively lower the viscosity of oil. Gilman represented that this technology would make oil flow through pipelines more efficiently and could be used in fracking, secondary oil recovery, oil storage, oil transportation, as well as for water separation and purification, among other applications.

### B. The Oil and Gas Offerings

15. From at least February 2013 through February 2015, Gilman solicited and obtained money from investors in Texas and other states for OMG, a company he claimed had developed a technology that used soundwaves to cheaply and effectively lower the viscosity of oil and that could be used in fracking, secondary oil recovery, storage, and transportation.

16. From at least June 2014 through April 2015, Gilman solicited and obtained money from investors in Texas and other states for WaveTech, a company he claimed had developed a technology that used soundwaves to enhance the water separation and purification processes involved with oil exploration and production.

17. Gilman formed OMG and WaveTech so that he would have entities in place that he could use to raise and receive investor funds. Gilman solicited and obtained money from the investors in OMG and WaveTech purportedly to test, validate, further develop, and license the

soundwave technology for use in oil and gas industry applications, and he promised the investors substantial profits.

18. Gilman sold to investors percentage equity interests in OMG, WaveTech, or both. In some instances, Gilman told investors they were purchasing an equity interest in whichever one of his soundwave technology ventures succeeded first. Gilman did not use a typical oil and gas offering memorandum. Rather, Gilman solicited and communicated with the investors orally and by sending emails, investment contract documents, and power point presentations. Gilman had ultimate authority over the statements and materials used in connection with the investments.

19. Gilman instructed investors where to wire their investment funds. Sometimes he told the investor to wire funds directly to his personal bank account or to a GilmanSound bank account he controlled, even though the investor was purchasing an interest in OMG or WaveTech. At other times, he requested the OMG or WaveTech investor to wire funds to a WaveTech bank account he controlled. Once received, the investor funds were commingled in and among the various GilmanSound, WaveTech, and personal accounts. Gilman, at all times, has controlled the bank accounts that received the investor funds. No investor funds identified to date were transferred to an OMG bank account, which, based on information obtained during the SEC staff's investigation, appears to have had a bank account open for less than six months with a balance that never exceeded $1,200.

20. In each instance, the investor paid money to purchase an interest in OMG, WaveTech, or both, and the investor expected to receive profits from the investment based solely upon the efforts and expertise of Gilman, including in developing, testing, and commercializing the soundwave technology. These were entirely passive investments, and the investors had no role or say in operations or management.

21. In total, Gilman raised at least approximately $3.3 million from approximately 40 investors located in multiple states and locations, including Texas, New York, Georgia, Tennessee, and California. Of those funds, at least approximately $1,030,000 were raised for OMG ($595,000) and WaveTech ($435,000). The rest were raised for OMG, WaveTech, and/or for GilmanSound. To date, the SEC's staff has been unable to further segregate the investments as a result of: (a) Defendants' extensive commingling of investor funds; (b) Defendants' failure to maintain adequate books and records; (c) Gilman's representations to certain investors that their funds would purchase an interest in whichever venture succeeded first; and (d) Gilman's invocation of his Fifth Amendment privilege against self-incrimination.

    **C.  Gilman Misused and Misappropriated Investor Funds**

22. Gilman told investors in OMG and WaveTech that he would use their funds to test, analyze, independently verify, further develop, and license the soundwave technology for oil and gas industry applications. As Gilman knew, this was false. Instead, Gilman spent substantially all of the investor funds on personal expenses and non-business items, including designer clothing, travel and dining, rent and home furnishings, and cash withdrawals at casino ATMs. Indeed, almost immediately after Gilman received funds from investors, he misappropriated the money to fund his lifestyle in Las Vegas and California.

23. When investor funds ran low, Gilman raised money from new investors or additional money from previous investors, and then quickly used those funds for his personal benefit as well. Gilman induced investors to invest, or continue to invest, by intentionally and falsely leading them to believe that everything was on track with the soundwave technology and that their funds were being used to complete testing and validation. Gilman, however, was continuing to spend investor funds for himself, which he never told investors.

24.     For example, Gilman induced a nurse who lives in Dallas, Texas to make a series of investments totaling $540,000 between February 2014 and March 2015 for equity interests in OMG and WaveTech by representing to her, among other things, that Gilman had developed new technology that affected the viscosity of oil and was raising funds to conduct formal testing, analysis, and independent scientific verification of that technology.

25.     As another example, Gilman persuaded a church minister living in Franklin, Tennessee to invest $100,000 in several installments in February and March 2013 for equity interests in OMG by representing to him, among other things, that Gilman needed additional investor funds to finalize field testing and development of his purported technology to bring it to market.

26.     As another example, Gilman induced a businessman and his company located in Houston, Texas to invest a total of $195,000 in installments between February 2014 and February 2015 for equity interests in OMG by representing to him, among other things, that based on the extensive study by his team, Gilman believed his soundwave technology could revolutionize the oil and gas industry.

27.     As a final example, Gilman convinced a psychology professor residing in Parker, Texas to make multiple investments, including at least $60,000 for equity interests in WaveTech in May 2014, by representing to him, among other things, that Gilman needed investment funds for engineering, equipment, testing, and sales costs.

28.     Gilman did not tell the investors that he was using their investment funds to pay for his personal expenses and other non-business items, including luxury Las Vegas hotels, restaurants, designer clothing, airline flights, home furnishings, ATM cash withdrawals at Las Vegas casinos, as well as transfers to his personal bank accounts.

29.     In at least one instance, Gilman also used investment funds from a new WaveTech investor to make a Ponzi payment to an earlier OMG investor. In February and March 2015, Gilman raised $100,000 and $50,000, respectively, from an investor for WaveTech that was deposited in a WaveTech bank account that had a balance of less than $2,100. In March 2015, Gilman then paid $100,000 of those investor funds to the OMG investor in Tennessee mentioned above, who had become disillusioned with Gilman and demanded his $100,0000 investment back. Gilman used the remaining $50,000 primarily for stays at multiple luxury Las Vegas hotels, clothing, and cash withdrawals.

30.     Gilman formed OMG and WaveTech to create the facade of legitimate businesses that he could use to raise and then misuse investor funds. He intentionally led investors to believe they were purchasing equity interests in promising technology start-up ventures. In reality, and as Gilman knew, OMG and WaveTech were a sham.

31.     The bank records do not reflect any investor funds being used for testing or developing the purported soundwave technology, and in fact do not appear to reflect any meaningful expenditures on business operations at all. Defendants have also failed to identify or document any investor funds that were spent on the testing or development of the soundwave technology. With the exception of the Ponzi payment and a payment made to an investor in a settlement of private litigation, there is no record of investors receiving any of their money back, much less a return on their investment. Instead, Gilman misappropriated the investor funds, and the accounts used to receive the investor funds are empty and currently closed.

### D.    Gilman Made Misrepresentations and Omissions

32.     Gilman made multiple misrepresentations and omissions to OMG and WaveTech investors between at least February 2013 and April 2015, in connection with the offer, purchase,

and sale of interest in OMG and WaveTech.

33.     Gilman, on behalf of OMG and WaveTech, represented to investors, including the investors discussed at Paragraphs 24-29 above, that their investment funds would be used to test, analyze, verify, further develop, or license the soundwave technology.  As Gilman knew, this was false and misleading, because Gilman used substantially all, if not all, of the investor funds on personal expenses, other non-business items, and one or more Ponzi payments.

34.     Gilman, on behalf of OMG and WaveTech, spoke or wrote to investors, including the investors discussed at Paragraphs 24-29 above, about how he would use their investment funds, but knowingly failed to disclose that he intended to and did use investor funds for personal expenses, other non-business items, and one or more Ponzi payments.

35.     Gilman on behalf of OMG and WaveTech made representations to investors, including the investors discussed at Paragraphs 24-29 above, as to the existence, validity, and status of the soundwave technology for use in oil and gas applications  Upon information and belief, including the fact that OMG and WaveTech produced documents in response to the staff's subpoenas in the underlying investigation but failed to produce documentation substantiating the existence or validation of the soundwave technology, Gilman's statements about the existence, viability, and status of the soundwave technology were false.

36.     Gilman on behalf of OMG and WaveTech also told investors that their investments were guaranteed to result in substantial profits—for example, promising at least one investor (the nurse in Dallas) that she would "reap incredible returns" and another (an individual investor in Georgia) that she would double her money "no matter what."  Gilman, however, knew that he was not using their investments to generate profits.

37.     Gilman's misstatements and omissions to the nurse in Dallas include the following:

   a. Gilman represented in February 2014 that her "investment contemplates an equity interest in O.M.G. for all operational and research endeavors" and acknowledged that an investment in OMG was "dedicated to lowering viscosity for the purpose of oil recovery and related applications." These statements were false and misleading, including because Gilman did not use the investor funds for such purposes and failed to disclose how he was actually using investor funds.

   b. Gilman represented in February 2014 that OMG "has the exclusive right to use and has licensed non-asset IP technology which affects oil viscosity and current oil recovery procedures." This was false and misleading, including because Gilman knew he was not limiting use of the purported IP technology to OMG and because OMG has produced no record of an exclusive right to use or of licensing the purported IP technology.

   c. Gilman represented in May 2014 that viscosity is the holy grail of the oil industry "and we've captured it" and that the "IP technology licensed by O.M.G. has moved from the development stage to proof of concept, and this memorandum of understanding reflects O.M.G.'s intention to conduct formal testing, analysis, and independent scientific verification that the IP technology used by O.M.G. changes oil viscosity." This was false and misleading for the reasons alleged above about licensing, exclusivity, and the use of funds, and

because Gilman knew he was creating the false impression of progress that had not occurred.

d. Gilman represented in May 2014 that he had "conducted exhaustive laboratory studies focused on applying his sound energy technology at certain frequencies to a 42 gallon barrel of diesel oil mixed with additives. These along with additional findings were confirmed through a series of independent tests conducted by a third party laboratory. . . . and the [t]est results were verified by outside experts." This was false and misleading, including because OMG has produced no record of third party testing or verification by outside experts.

e. Gilman represented in May 2014 that he had "invented a non-chemical / non-additive process (Patent Pending) to lower oil viscosity to reduce friction created by agitation of surface pipeline roughness during transport" which "innovative process is based on *sonication*." This was false and misleading for the reasons alleged above, and including because Gilman knew he was creating the false impression of progress that had not occurred.

f. Gilman represented that if the Dallas nurse invested she would "reap incredible returns." This statement was false and misleading, including because Gilman knew that he was no using investor funds to generate profits.

g. Gilman told the Dallas nurse that her initial investment of $40,000 was for an equity interest in OMG. But Gilman knew at the time that OMG had not yet been formed, which he did not disclose. It is false and misleading to knowingly sell an investor securities in a company that does not exist.

38.     Defendants obtained money from investors by means of the misrepresentations and omissions, much, if not all of which, Gilman spent on himself.  Gilman made the misrepresentations and omissions knowingly or with severe recklessness, and his knowledge and state of mind is imputed to OMG and WaveTech, entities he controlled.  Further, a reasonable investor would have considered the misstatements and omissions about the use of investor funds and the status of the soundwave technology important in deciding whether to invest.

### E.     Gilman Also Defrauded GilmanSound Investors

39.     Gilman also misled GilmanSound investors and misappropriated GilmanSound investment funds.  Gilman misused substantially all of the investor fund deposited into the known GilmanSound bank accounts during the Relevant Period on the same types of personal expenses and non-business items described above.

40.     For example, a businessman in California invested $700,000 in GilmanSound, including approximately $275,000 that he wired in December 2013.  Gilman represented to the investor that Gilman was a successful musician and artist who had developed a sound system that could dramatically change the way sound is conveyed in large stadiums.  Gilman offered the California businessman an investment opportunity to buy ownership interests in GilmanSound with the promise of a return once the company succeeded and later sold.  Based on conversations with Gilman, the investor understood his $275,000 would be used on research and development for the sound technology, travel costs to sell the technology, and other business operation expenses.  However, Gilman commingled these funds with other investor funds (and some legitimate revenues earned from the stadium installation work), and then used the combined funds to take a cruise and for luxury Las Vegas hotels, designer clothing, airline

flights, designer luggage, home furnishings, legal expenses, and cash withdrawals and transfers to his personal bank accounts.

41. Then, in July 2014 and May 2015, Gilman told the investor he needed loans for the use of the GilmanSound business. Specifically, Gilman said that another investor reneged on an anticipated investment, and he needed funds to pay a supplier for various business needs or they would lose out on an important business opportunity. As a result, the investor made an investment loan of $50,000 to GilmanSound in July 2014 in exchange for an investment agreement guaranteeing a $50,000 return on the investment, and a second investment loan of $25,000 to GilmanSound (but deposited in Gilman's personal account) in May 2015 in exchange for a note guaranteeing a $5,000 return on the investment.

42. Gilman's statements and omissions to the investor were false and misleading, as Gilman knew. The funds from the investment loans were not used to pay a supplier for business needs. Instead, Gilman commingled the funds with other investor funds and, like he did with the other investment funds GilmanSound received during the Relevant Period, spent them on personal and other non-business expenses. The investment loans were never repaid.

43. Gilman also used GilmanSound to misappropriate funds from OMG and WaveTech investors. First, Gilman lured investors into the OMG and WaveTech ventures by highlighting his musical past and ongoing GilmanSound efforts to legitimize his claimed soundwave expertise to persuade others that he was capable of developing these technologies. Second, Gilman used the GilmanSound bank account to solicit, receive, and then misappropriate investor funds designated for investments in OMG or WaveTech.

## FIRST CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act
(against all Defendants)**

44. The SEC reallages and incorporates by reference each and every allegation contained in the paragraphs above.

45. By engaging in the conduct described herein, Defendants, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce and/or by use of the mails has: (a) employed devices, schemes, and artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and courses of business which operate or would operate as a fraud and deceit upon the purchasers.

46. With regard to his violations of Section 17(a)(1) of the Securities Act, Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness. With regard to his violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, Defendants acted at least negligently.

47. By reason of the foregoing, Defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q].

## SECOND CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
(against all Defendants)**

48. The SEC reallages and incorporates by reference each and every allegation contained in the paragraphs above.

49. By engaging in the conduct described herein, Defendants directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce and/or or by use of the mails, in connection with the purchase or sale of securities: (a) employed devices, schemes, and artifices to defraud;  (b) made untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operate or would operate as a fraud and deceit upon purchasers, prospective purchasers, and any other persons.

50. Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.

51. By reason of the foregoing, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
(against Defendant Gilman)**

52. The SEC reallages and incorporates by reference each and every allegation contained in the paragraphs above.

53. By engaging in the conduct described above, Gillman knowingly or with severe recklessness provided substantial assistance to OMG's, WaveTech's, and GilmanSound's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

54. By reason of the foregoing, pursuant to Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act, Gilman aided and abetted OMG's, WaveTech's, and GilmanSound's violations of, and unless restrained and enjoined will continue to aid and abet violations of, Section 17(a) of the Securities Act [15 U.S.C. § 77q] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## RELIEF REQUESTED

Therefore, the SEC respectfully requests that this Court:

(a) Permanently enjoin Defendants and their agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(b) Order Defendants to disgorge all ill-gotten gains and/or unjust enrichment realized by them, plus prejudgment interest;

(c) Order Defendants to each pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(d) Grant such further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

The SEC demands a trial by jury on all issues that may be so tried.

Dated: July 27, 2018                                  Respectfully submitted,

                                                              */s/ Keefe M. Bernstein*
                                                              Keefe M. Bernstein
                                                              Lead Attorney
                                                              Texas Bar No.  24006839
                                                              Securities and Exchange Commission
                                                              801 Cherry Street, Suite 1900
                                                              Fort Worth, TX  76102
                                                              (817) 900-2607 (phone)
                                                              (817) 978-4927 (facsimile)
                                                              bernsteink@sec.gov

                                                              Counsel for Plaintiff
                                                              Securities and Exchange Commission

## **CERTIFICATE OF SERVICE**

I affirm that on July 27, 2018, I caused the foregoing First Amended Complaint to be electronically filed with the Clerk of the Court for the Northern District of Texas, Dallas Division, by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants. I further certify that on July 27, 2018, I caused the foregoing to be served by U.S. Mail and email to:

John Teakell
Law Office of John R. Teakell
2911 Turtle Creek Blvd, Suite 300
Dallas, TX  75219
(214) 523-9076
teakell@teakelllaw.com

*Counsel for Defendants*

>  */s/ Keefe M. Bernstein*
>  Keefe M. Bernstein